STATE OF MISSOURI at the relation of UNITED FACTORIES, INC., Relator, v. JEFFERSON D. HOSTETTER, WILLIAM DEE BECKER and EDWARD J. McCULLEN, Judges of the St. Louis Court of Appeals.—126 S. W. (2d) 1173.

Division One, April 1, 1939.

*M. W. Borders, Jr.,* and *Ethan A. H. Shepley* for relator; *Borders, Warrick & Hazard* and *Nagel, Kirby, Orrick & Shepley* of counsel.

*Wayne Ely* and *Lyon Anderson* for respondents; *Leahy, Walther, Hecker & Ely* of counsel.

388

FERGUSON, C.—This is an original proceeding by certiorari. The relator prays this court to quash the opinion and judgment of the St. Louis Court of Appeals in the case of United Factories, Inc., v. Brigham (Mo. App.); 117 S. W. (2d) 662, which was an action for damages for libel. The plaintiff therein had verdict for $4000 actual damages and $1000 punitive damages, and judgment thereon. Upon defendant's appeal, the St. Louis Court of Appeals reversed the

judgment and remanded the cause, whereupon at the instance of plaintiff, as relator, we granted the writ herein.

In this kind of a proceeding, we look to respondents' opinion for the facts and accept same, as therein stated, as the facts of the case ruled. The plaintiff (relator here), a corporation, was engaged in the manufacture and sale of an oil burner known as "The Heat King Oil Burner." The sole defendant James W. Brigham, was also engaged in the manufacture and sale of an oil burner, "doing business under the trade name of Brigham Oil Burner Company." It will be noted that the Brigham oil burner business was not carried on "by a corporation, nor by a company" but individually by defendant Brigham under the trade name. Both plaintiff and defendant "contacted prospective purchasers, through advertising in newspapers and magazines, and such purchasers became agents for further sales in their respective localities." Albert Kaysing, the sales manager, and one Goldstein were "in active charge" of the Brigham oil burner business. In the course of his employment, as sales manager for defendant Brigham, Kaysing "issued" and "sent out" "Confidential Bulletin No. 62," which is the basis of plaintiff's action for libel. The bulletin is set out in full in respondents' opinion. It suffices here to say that it referred to and compared certain other types of oil burners, then being advertised and sold, with the Brigham burner to the advantage of the latter and made certain statements in reference to such other oil burners which plaintiff alleged to be "false, malicious and libelous." "The bulletin did not refer to plaintiff or its product by name" but plaintiff's petition alleged that certain statements and drawings therein "were intended, and were understood by the person receiving said bulletin, to refer to plaintiff's oil burner." Kaysing issued the bulletin "without the knowledge or consent of the defendant. In fact, as soon as defendant Brigham learned of the existence of this bulletin, he immediately ordered Kaysing to stop sending it out."

Plaintiff's first assignment of conflict relates to respondents' holding, as to plaintiff's instruction "authorizing the jury to return a verdict for punitive damages," that "it was improper to allow for punitive damages." That part of respondents' opinion relating to the allowance of punitive damages follows: "It will be noted that the defendant James W. Brigham was the sole defendant. . . . The plaintiff having placed both Albert L. Kaysing, sales manager for defendant, and defendant himself on the witness stand, therefore vouched for their credibility and, under the generally recognized rule, was prohibited from impeaching them, but, of course was permitted to elicit testimony from other witnesses stating facts other than and differing from those stated in the testimony of these two witnesses.

"The defendant testified as follows: 'Mr. Kaysing is sales manager, and he and Goldstein are in active charge of the business of the

Brigham Oil Burner Company. Kaysing manages the end pertaining to the salesmen and Goldstein looks after more the mechanical end and service installations and does some of the bookkeeping. When Mr. Kaysing put out this bulletin—Confidential Bulletin No. 62—I did not know about it until after a thousand or fifteen hundred had been distributed. Then I put a stop to it. I was very emphatic about it; I told them not to send out any more, and, as far as I know, they did not send out any more.'

"Defendant's employee, Albert Kaysing, testified as follows on the subject: 'I did not consult with anyone before I sent these bulletins out, and did not talk to Mr. Brigham. When Mr. Brigham saw them he stopped them right away, and said, "Don't send any more of them out." '

"The testimony of these two of plaintiff's witnesses clearly negatives the existence of any malice on the part of James W. Brigham, consequently, error was committed in submitting the question of punitive damages."

It was early "firmly established" in this State, by the decisions of this court, that in a civil action for damages for injury resulting to plaintiff from a wrongful act, that is, "in all actions of tort, whether for assault and battery, or for trespass or libel or slander," where the wrongful act was willful, wanton, oppressive or malicious, exemplary or punitive damages may be recovered against the wrongdoer. [Buckley v. Knapp, 48 Mo. 152, 162; Milburn v. Beach, 14 Mo. 105; Corwin v. Walter, 18 Mo. 72.] It is needless to cite authority to the effect that such rule has been uniformly maintained in this State.

We have consistently sustained the award of punitive damages against a corporate defendant (private corporation) for the wrongful act of its servant or agent in the course or line of his employment when the evidence shows such wrongful act was done willfully, wantonly or maliciously. [Perkins v. Mo., K. & T. Railroad, 55 Mo. 201; Malecek v. Tower Grove & Lafayette Ry. Co., 57 Mo. 17; Graham v. Pac. Railroad Co., 66 Mo. 536, 541; Haehl v. The Wabash Ry. Co., 119 Mo. 325, 24 S. W. 737; McNamara v. St. Louis Transit Co., 182 Mo. 676, 81 S. W. 880; Lampert v. Judge & Dolph Drug Co., 238 Mo. 409, 141 S. W. 1095; Simmons v. Kroger Grocery & Baking Co., 340 Mo. 1118, 104 S. W. (2d) 357.] The basis for the recovery of punitive damages against a corporation for the willful, wanton, or malicious act of its agent or servant, in the course of his employment, is first stated by this court, in Perkins v. Mo., K. & T. Railroad, 55 Mo. 201, 214, and reaffirmed in Haehl v. The Wabash Ry. Co., 119 Mo. 325, 343, 24 S. W. 737, 741, as follows: "The only way in which corporations can act . . . is by and through their agents. The acts of their agents within the scope of their authority are their acts, and it would seem that there could be no good reason why they should not be

responsible for the acts of their agents in the discharge of their duties, when performed in a wanton and malicious manner, just as if the act had been done by the corporation itself. In fact, the act of the agent is the act of the corporation.''

We digress here to observe, that, so far as same relates to a corporation, we do not agree with the proposition advanced in respondents' brief that this court in the Perkins case, supra (55 Mo. 201) announced a rule, which it has never since disapproved, that ''no master, whether corporate or otherwise, can be compelled to respond in exemplary damages for the malicious act of a servant unless the master directed the particular act to be done, or ratifies it after it is done.'' In the Perkins case this court approved plaintiff's instruction authorizing the recover of punitive damages against the corporate defendant for the malicious act of its agent. The instruction was predicated solely upon a finding that the defendant's conductor acted wrongfully and maliciously in putting plaintiff off the train. The actual holding in that case was that a corporate defendant, without qualification, is liable in punitive damages for the malicious acts of its servant or agent done in the course of his employment. Respondents' proposition is apparently based upon an observation made by the writer of the opinion which, we believe, upon an analysis of the ruling actually made, will be found to be *dictum.* However, such theory, so far as it relates to a corporation, is specifically disapproved by this court in the Haehl case, supra (119 Mo. l. c. 342, 343, 24 S. W. l. c. 741), as is pointed out and confirmed in Simmons v. Kroger Co., supra (340 Mo. l. c. 1124, 104 S. W. (2d) l. c. 360), and it was held that a corporate defendant is liable, in punitive damages, for the wanton and malicious act of its agent or servant, in the course of his employment, regardless of whether the corporation directed or commanded the particular act to be done or subsequently approved or ratified it.

The case ruled by respondents' opinion is, however, an action against an individual defendant for alleged libelous statements appearing in a bulletin, which was issued and distributed by his agent, in the course of the agent's employment, without the defendant's knowledge, active participation or approval, and when defendant learned of the bulletin he stopped its further distribution. The foregoing was shown by plaintiff's evidence and apparently there was no evidence in the case tending to show otherwise. Relator is correct in its position that legal malice, that is the intentional doing of a wrongful act without just cause, as distinguished from actual malice ''will justify exemplary damages in this State.'' [Lampert v. Judge & Dolph Drug Co., 238 Mo. 409, 418, 419, 141 S. W. 1095, 1098; McNamara v. St. Louis Transit Co., 182 Mo. 676, 680, 81 S. W. 880.] Therefore in an action against Kaysing, the agent, who issued and distributed the alleged libelous bulletin, plaintiff might

base a claim for punitive damages upon legal malice. But the action was against the individual employer alone and not against the agent. The effect of the Court of Appeals ruling seems to be that under the facts shown by plaintiff's evidence such malice could not be imputed to the defendant, an individual employer, so as to make him liable in punitive damages.

We have pointed out that this court has held (and the reasoning thereof) that a corporate defendant is liable, in punitive damages, for the wrongful and malicious act of its agent or servant in the course of his employment. However relator has not directed our attention to, nor have we found, any decision by this court holding that an individual, or natural person, can be held liable in punitive damages for the wrongful and malicious or wanton act of his agent or servant done in the course of his employment, where such individual principal or master did not personally participate in the doing of such wrongful act, have knowledge thereof, acquiesce therein, consent thereto or subsequently ratify such act. It seems that precise question has not been ruled by this court.

Relator claims respondents' opinion, in its ruling relative to punitive damages, is in conflict with the following decisions of this court; Haehl v. The Wabash Ry. Co., supra; McNamara v. St. Louis Transit Co., supra; Lampert v. Judge & Dolph Drug Co., supra; Callahan v. Ingram, 122 Mo. 355, 26 S. W. 1020; Peak v. Taubman, 251 Mo. 390, 158 S. W. 656; Leahy v. Davis, 121 Mo. 227, 25 S. W. 941. The Haehl, McNamara and Lampert cases, as we have heretofore noted, involve the liability of a corporate defendant, in punitive damages, for the wrongful and malicious act of its agent or servant done in the course of his employment, consequently respondents' ruling that, under the circumstances shown by plaintiff's evidence, the individual defendant is not liable in punitive damages for the malicious and wrongful act of his agent, is not in conflict therewith. The Callahan case and also the Peak case are actions against an individual defendant for alleged slander by the defendant himself. The malicious act of an agent is not involved in either case and it does not appear wherein respondents' opinion conflicts with or contravenes either case. The Leahy case was an action against the individuals composing a partnership. Negligence was alleged in the construction and maintenance of the doors to a freight elevator. The trial court refused plaintiff's instruction authorizing punitive damages and this court approved that action. The question of the liability of an individual defendant for punitive damages for the malicious act of his agent done in the course of his employment without the defendant's knowledge, consent, acquiesence or participation therein, or his subsequent ratification thereof, is not raised or ruled and we do not find that respondents' opinion is in conflict with our decision in that case.

■ Relator's second assignment of conflict relates to respondents' ruling that two unidentified writings purporting to be letters received by plaintiff from two purchasers of its burner, who were also plaintiff's agents, were improperly admitted in evidence on the part of plaintiff. The purported letters are set out in full in the opinion. In each the purported writer states that he has received the bulletin issued by Brigham Oil Burner Company, the basis of this action, evidences that he understands the statements therein in reference to other types of oil burners to refer to plaintiff's burner and inquires concerning the allegations of the bulletin in reference to such other type of burners. Respondents' opinion says: "Inasmuch as the bulletin, which is the basis of this suit, did not name the plaintiff it became necessary for the plaintiff to introduce evidence tending to show that the bulletin had reference to it, and, it was also obligatory on plaintiff to show that persons reading the bulletin understood that it referred to the plaintiff." (Citing cases.)

"The plaintiff sought to show that persons reading the bulletin understood it to refer to the plaintiff by introducing two letters in evidence. One of these letters purported to be from Harvey Johnson, who had just become an agent or dealer of plaintiff, and reads as follows:" (Letter is set out.)

"The other one purported to be from M. H. Hemstead, . . . who was also an agent or dealer for plaintiff, . . . reads as follows:" (Letter is set out.)

"As to these two letters defendant objected to their admission in evidence on the ground that neither of them had been properly identified and that they were hearsay and that defendant had no opportunity to cross-examine the authors of the letters offered. The court overruled the objections and both letters were read in evidence, to which exceptions were saved, after which counsel for defendant moved that they be stricken out," etc.

"We are of the opinion that the trial court was in error in permitting these letters to be read in evidence and that the objections made to their admission by defendant's counsel should have been sustained."

In support of the ruling the opinion notes the "generally accepted rule" as announced by two authorities, quoting from each; (1) 3 Wigmore on Evidence (1904 Ed.), par. 2148, the concluding part of which reads: "It seems generally conceded that the mere contents of a written communication, purporting to be a particular person's, are, of themselves, not sufficient evidence of genuineness;" (2) 9 A. L. R. 987; "The generally accepted rule is to the effect that the mere fact that a letter (other than a reply letter) purports to have been written and signed by the person in question is insufficient to establish its authenticity and genuineness." The opinion then continues: "This general rule is supported by a wealth of authorities, among which are the following: Brown v. Massey, 138 Mo. 519, 38 S. W. 939; Fowle v. Adams Express Co., 9 Mo. App. 572.

"The reason for the distinction being made, between reply and other letters, is well stated by Judge ROMBAUER in Sanders Publishing Co., v. Emerson, 64 Mo. App. 662, wherein the following language is used: 'A well recognized exception to the rule requiring proof of handwriting is that of letters received in reply to others proved to have been sent to the party at his usual place of business or residence. . . . This rests upon the presumption that letters are delivered to the person to whom addressed, and that the reply was written by him or by his authority.' "

"These letters were merely hearsay. The authors of the letters thus improperly admitted in evidence were competent witnesses and could have been produced as witnesses on behalf of plaintiff, or, their depositions could have been taken and read in evidence by the plaintiff, and, in either event they would have been subject to cross-examination by defendant." (Authorities cited.)

Relator says the foregoing ruling of the Court of Appeals that the purported letters were improperly received in evidence is in conflict with the holding of this court in the following cases: Russell & Co. v. The State Ins. Co., 55 Mo. 585; Reese v. Fife (Mo.), 279 S. W. 415; O'Leary v. Scullin Steel Co., 303 Mo. 363, 260 S. W. 55; and State v. Loehr, 93 Mo. 103, 5 S. W. 696.

The Russell case was an action on a policy of fire insurance. One issue was the waiver by the defendant company of the terms of the policy relating to the filing of proof of loss within thirty days. The trial court permitted the plaintiffs to put in evidence a letter which they claimed to have received from the defendant insurance company. "The defendant proved it was not" in the "handwriting" of its secretary, "but the plaintiff proved that it was a letter received by them in reply to a letter addressed to the company." This court, holding the letter was properly admitted, said: "This letter offered to show that the objections to the plaintiff's particular account of the loss . . . were not upon the ground that it was not in time, but that it was not sufficiently explicit in details. It appeared very clearly, that this letter was received by the plaintiffs in answer to one addressed to the company, and although not in the handwriting of Strong (the secretary of the company) prima facie emanated from the office of the company, and no proof being offered to the contrary, must be taken as an authoritative letter." Relator seems to take the position here that, pursuant to the Russell case, the purported letters from its agents, though unidentified, were properly admitted in evidence as "reply letters." There is no similarity with the facts in the Russell case. In that case the evidence showed that the letter received by plaintiffs "emanated from defendant's office," was "in answer" to a letter from plaintiffs to defendant, and related to the matter in controversy between the parties. The letters ruled by respondents were purportedly from persons who were not parties

to the action and there is nothing in the evidence as set out in the opinion, or the content of the letters, to indicate they could be designated as "reply letters." The Court of Appeals did not consider them, or find them to be, reply letters, and apparently no such contention was there made. Clearly respondents' opinion is not in conflict with the ruling of this court in the Russell case.

The facts in the Reese case, supra, are exceedingly lengthy. It is difficult to condense them to a brief statement which would suffice to adequately depict the situation existing in that case which made the letters, written by one not a party to, or witness in, the case, admissible in evidence on the part of plaintiff as tending to refute certain allegations of the answer. In that case plaintiff's evidence was that he discovered that an adulterous relationship existed between his wife and defendant's son. Plaintiff brought suit for divorce in which his wife filed a cross petition. Defendant actively participated in the divorce suit on behalf of plaintiff's wife. Following the divorce suit defendant made threats to the effect that he "intended to prosecute and imprison" plaintiff. The mother of plaintiff's former wife (a divorce having been granted) was defendant's sister. She wrote a letter to defendant beseeching him to refrain from his announced purpose of instituting a criminal prosecution against plaintiff. Defendant's reply letter to his sister was to the general effect that plaintiff was a criminal, a blackguard, a blackmailer, etc. The letter eventually came to plaintiff's hands and was the basis of the action against defendant for libel. Defendant's answer pleaded the truth of the matter stated in the letter and was even more emphatic and specific in charges against plaintiff than was the letter. The very lengthy answer alleged, *inter alia*, that "plaintiff conspired to rob and blackmail R. O. Fife, defendant's son. That plaintiff falsely charged R. O. Fife with having had improper relations with plaintiff's wife" and that plaintiff and his associates had held R. O. Fife prisoner and threatened him with revolvers and compelled him to transfer property to plaintiff, etc. Plaintiff had evidence tending to show a conspiracy between defendant and his son and others to falsely charge plaintiff with criminal and improper acts and conduct. The trial court admitted in evidence, on the part of plaintiff, a series of letters identified as having been written by defendant's son R. O. Fife to plaintiff's wife. Apparently the authenticity of the letters was admitted. These letters tended to show the existence of an immoral relationship between plaintiff's wife and defendant's son and to refute the allegation of the answer that plaintiff had robbed or blackmailed defendant's son. This court, without discussing the admission of identified, or unidentified, letters or writings of one who is neither a party to nor a witness in the case, or announcing any rule of law governing same, held, that under the facts of the case the letters were properly admitted and said: "The threats made by the defendant established,

prima facie, a conspiracy between him and his son, so that the acts and declarations of one are admissible in evidence against the other. (Citing cases.) The letters were competent and admissible to refute the allegations of the answer, charging that plaintiff entered into a conspiracy to blackmail and rob defendant's son by means of a false charge of improper relations between Mrs. Reese (plaintiff's wife) and Raleigh Fife (defendant's son), as verbal or written acts evidencing their adulterous relations, and to prove actual malice.'' Thus it appears that respondents' ruling, in respect to the admissibility of the letters in question, does not declare or apply any general conclusion or rule of law governing same which can be said to impugn or contravene a general rule or principle of law on the same subject announced by this court in the Reese case nor can it be said that the facts ruled by respondents are similar or equivalent to the facts ruled in the Reese case so as to create a conflict with the decision of this court in that case.

We are unable to discover the pertinency of the two remaining decisions of this court cited by relator in support of its second assignment of conflict. [O'Leary v. Scullin Steel Co., supra, and State v. Loehr, supra.] The O'Leary case was an action for personal injury resulting from the negligence of a crane operator in lowering a mold. As it was conceded that testimony that the foreman of the molders had complained of the crane operator's method of operating the crane was competent to prove knowledge of the operator's incompetency, it was held that evidence of specific instances of what the foreman said as to the operator's method of running of the crane was not objectionable as hearsay. State v. Loehr was a prosecution for larceny. It was held in that case that conversations of a witness with the defendant with reference to the ownership of the property alleged to have been stolen were properly admitted as tending to show knowledge on the part of the defendant of the ownership of the property. Neither case discusses or announces any rule of law relating to the admission of evidence and upon reading thereof it readily appears that nothing said or ruled, by this court, in either case applies to or controls the facts ruled by respondents in determining the admissibility of the letters involved in the case ruled, and therefore no conflict with our decision in either of the two foregoing cases results.

█ It is well settled that, on certiorari, this court will not quash the opinion of a Court of Appeals unless the ruling of that court on the point involved announces and applies some general rule or principle of law contrary to a controlling announcement of this court upon the same subject, or, on a given state of facts, makes a ruling contrary to a controlling decision of this court on an equivalent or similar state of facts; that is, unless it clearly appears that the ruling of the Court of Appeals conflicts with, or contravenes, a controlling decision of this court ruling the point in question. [State ex rel. K.

C. So. Ry. Co. v. Shain, 340 Mo. 1195, 105 S. W. (2d) 915; State ex rel. Metropolitan Life Ins. Co. v. Shain, 334 Mo. 385, 391, 66 S. W. (2d) 871, 873; State ex rel. Himmelsbach v. Becker, 337 Mo. 341, 343, 85 S. W. (2d) 420, 421.] We have examined the decisions of this court which relator asserts are contravened but we do not find respondents' opinion, in respect to either of the rulings put in question herein, to be in conflict therewith, nor do we know of any decision of this court which is contravened by the opinion of the Court of Appeals in this instance. It therefore follows that our writ herein should be quashed. It is so ordered. *Hyde* and *Bradley, CC.,* concur.

PER CURIAM:—The foregoing opinion by FERGUSON, C., is adopted as the opinion of the court. All the judges concur.